1

2

3                                                   FILED        ENTERED
                                                 LODGED        RECEIVED
4
                                                  OCT 18 2002
5
                                              CLERK U.S. DISTRICT COURT
                                          WESTERN DISTRICT OF WASHINGTON
6                                         BY                          DEPUTY

7
                        UNITED STATES DISTRICT COURT
8                    WESTERN DISTRICT OF WASHINGTON
                                AT SEATTLE
9

10   LAURINE HARRIS, et al.,

11                      Plaintiffs,
                                                    CASE NO. C02-1481C
12          v.
                                                    ORDER
13   UNITED STATES DEPARTMENT OF
     HOUSING AND URBAN DEVELOPMENT,
14   et al.,

15                      Defendants.

16          This matter comes before the Court on plaintiffs' motion for preliminary injunction (Dkt. No. 2)

17   and defendant Seattle Housing Authority's motion for partial summary judgment (Dkt. No. 38).  The

18   Court has considered the papers submitted by the parties and determined that oral argument is not

19   necessary.  For the following reasons, plaintiffs' motion for preliminary injunction is hereby DENIED,

20   and defendant Seattle Housing Authority's motion for partial summary judgment is hereby DENIED.

21   I. FACTS AND PROCEDURAL HISTORY

22          Rainier Vista, a low-income public housing project in Seattle's South End, and immediately

23   surrounding areas in the Rainier Valley share a cultural diversity and richness rare to Seattle.  Rainier

24   Vista and immediately surrounding areas in the Rainier Valley also represent one of Seattle's highest

25

26   ORDER   1

                                                                        60

1   concentrations of very low-income individuals and racial and ethnic minorities. In 1999, the United
2   States Department of Housing and Urban Development awarded the Seattle Housing Authority a $35
3   million HOPE VI grant to demolish and redevelop the Rainier Vista public housing project. HOPE VI is
4   a Congressionally-authorized program expressly committed to the deconcentration of low-income public
5   housing. That is, the program provides financial assistance to local housing authorities to both demolish
6   severely distressed low-income public housing and replace such housing with mixed-income housing,
7   including very low-income housing and below and at-market rental and for-sale units. The 481 units at
8   Rainier Vista, with a capacity of approximately 1,200 residents, are in extremely poor physical
9   condition. The units were constructed mid-century to temporarily house Boeing wartime workers.

10      Rainier Vista residents, members of surrounding communities, and local politicians expressed
11   serious concerns that the HOPE VI-funded redevelopment project could actually result in a net-loss of
12   "very low-income public housing" in the city. In response to these concerns, in 2001 the City of Seattle
13   and Seattle Housing Authority entered an agreement to replace one-for-one all 481 very low-income
14   units scheduled for demolition by the project. In addition, between 1999 and 2001, the Authority took
15   several steps to educate residents about and prepare residents for the redevelopment project. These steps
16   included meetings and question-and-answer sessions, relocation counseling, and the assurance of
17   temporary replacement housing. Further, the Authority made a commitment to residents that they would
18   have the opportunity to return to the redeveloped Rainier Vista. In October 2001, the Authority
19   completed its final environmental impact statement pursuant to the Washington State Environmental
20   Policy Act. The City, bearing responsibility for compliance with the National Environmental Policy
21   Act, published its environmental assessment and finding of no significant impact in December 2001. At
22   present, approximately half of Rainier Vista's residents have relocated. Their units stand vacant,
23   awaiting demolition.

24   II.  PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

25      Plaintiffs' claims in this action arise pursuant to the Fair Housing Act and National
26   ORDER – 2

1    Environmental Policy Act.  Plaintiffs seek the following preliminary injunctive relief:

2        Defendants Seattle Housing Authority and Harry Thomas are enjoined from the demolition
         or damaging of any existing structures or any infrastructure, including rental units, water,
3        sewer, electrical, streets, trees, or landscaping at Rainier Vista.  Those defendants are further
         enjoined from expending any HOPE VI funds for the redevelopment of Rainier Vista.
4        Defendants HUD and Mel Martinez are enjoined from issuing any further approvals or
         releasing any further HOPE VI funds for the redevelopment of Rainier Vista.  Those
5        defendants shall freeze or recall any HOPE VI funds that have been previously released.
         Defendant City of Seattle is enjoined from issuing any further permits relating to the Rainier
6        Vista HOPE VI redevelopment or providing any further financial assistance to the
         redevelopment.

7
     Preliminary injunctive relief is appropriate where plaintiffs demonstrate either (1) a probability of
8
     success on the merits and the possibility of irreparable injury or (2) the presence of serious legal issues
9
     and the balance of hardships tilts in plaintiffs' favor.  Rodeo Collection, Ltd. v. West Seventh, 812 F.2d
10
     1215, 1217 (9th Cir. 1987).  To overcome a weak showing of meritoriousness, plaintiffs must make a
11
     very strong showing that the balance of hardships tilts in plaintiff's favor.  Id.[1]
12
     A.  Plaintiffs' Fair Housing Act Claims
13
           Plaintiffs allege that defendants Seattle Housing Authority ("the Authority") and the United
14
     States Department of Housing and Urban Development and its Secretary, Mel Martinez (collectively
15
     "HUD") violated the Fair Housing Act ("the Act") by failing to affirmatively further fair housing via the
16
     Rainier Vista redevelopment project.  The Act declares the provision of fair housing to be national
17
     policy.  42 U.S.C. § 3601 (2002).  The Act prohibits housing discrimination based upon race, color,
18
     religion, sex, handicap, familial status, and national origin.  42 U.S.C. §§ 3604-3606, 3631 (2002).
19
     Further, the Secretary of HUD must "administer the programs and activities relating to housing and
20
     urban development in a manner affirmatively to further the policies of [the Act]."  42 U.S.C. §
21
     3608(e)(5) (2002).  Specifically, plaintiffs allege that the Authority and HUD did not adequately assess
22

23
          [1] Plaintiffs challenge defendants' submission of evidence outside the administrative record.
24   However, as all parties concede, the Court does not presently have the complete administrative record
     before it.  The Court has only considered the challenged evidence to the extent it relates to equitable
25   issues of public interest and the balance of hardships.

26   ORDER – 3

1  the racial and socioeconomic effects of the Rainier Vista redevelopment project on the surrounding area.

2  Plaintiffs also contend that the Act requires an agency "to establish an adequate institutionalized process

3  to assess the fair housing impacts of its decisions before it makes them." The Authority and HUD

4  challenge plaintiffs' claims on a number of independent grounds.

5        The procedural duties plaintiffs seek to impose are outlined in neither the statute itself nor the

6  accompanying administrative regulations. Instead, plaintiffs rely on two seminal cases—Anderson v.

7  City of Alpharetta, 737 F.2d 1530 (11th Cir. 1984) and Shannon v. HUD, 436 F.2d 809, 818 (3d Cir.

8  1970)—for the proposition that HUD may be liable for approving federal financial assistance for public

9  housing without considering, via some institutionalized method, its effect on the racial and

10  socioeconomic composition of surrounding areas. In Anderson, the Eleventh Circuit confronted a local

11  housing agency's extensive history of racially-motivated housing decisions. 737 F.2d at 1531-33. The

12  court concluded that HUD may be liable for disbursing funds to local housing authorities for projects

13  that will increase or perpetuate residential segregation. Id. at 1537 (citations omitted). The Anderson

14  court relied largely on Shannon. In Shannon, the "essential substantive complaint" was that "the

15  location of this type of project on the site chosen will have the effect of increasing the already high

16  concentration of low income black residents" in the community. 436 F.2d at 811-12. The Shannon

17  opinion is replete with references to this underlying substantive principle: the increase or perpetuation of

18  racial segregation offends the Act. Id. at 819-21. The Third Circuit concluded: "We hold only that the

19  agency's judgment must be an informed one; one which weighs the alternatives and finds that the need

20  for physical rehabilitation or additional minority housing at the site in question clearly outweighs the

21  disadvantage of increasing or perpetuating racial concentration." Id. at 822.

22        The unifying thread that binds Anderson, Shannon, and other relevant cases is an allegation by

23  plaintiffs that the housing project at issue threatens the policies of the Fair Housing Act. Plaintiffs

24  identify no case in which a court, citing § 3608(e)(5), imposed the procedural duties outlined by

25  Shannon when there was no underlying allegation that the housing project at issue in fact threatened the

26  ORDER – 4

1   policies of the Act.  Here, plaintiffs' fair housing concerns relate to altered "cultural mix", increased

2   property values, taxes, and rental rates, and the potential displacement of low-income individuals from

3   the Rainier Valley.[2]  However, plaintiffs raise no concerns related to the increase or perpetuation of

4   racial segregation or any other substantive policies embodied in the Act, including housing

5   discrimination based on color, religion, sex, handicap, familial status, or national origin.

6          Plaintiffs read Shannon too broadly.[3]  Plaintiffs' interpretation of Shannon and its progeny

7   impermissibly transforms the Act into a NEPA-like statute when the statutory language and

8   administrative regulations express no such intent.  In contrast to NEPA, the Act, on its face, is not a

9   procedural rights statute.  Thus, this Court cannot purport to impose judicially-created procedural duties

10  pursuant to the Fair Housing Act when plaintiffs fail to allege that the redevelopment of Rainier Vista

11  actually threatens any polices embodied in the Act.  These procedural duties have no independent

12  statutory basis.  The Court concludes, as a matter of law, that plaintiffs fail to state a claim upon which

13  relief can be granted pursuant to the Fair Housing Act.  See Fed. R. Civ. P. 12(b)(6).  Accordingly, the

14  Court DISMISSES plaintiffs' Fair Housing Act claims.

15

16          [2] Although the word appears only once in the parties' briefs, plaintiffs appear to challenge the
    combination of socioeconomic forces referred to as gentrification.  The Court recognizes that, from
17  plaintiffs' perspective, gentrification is an important fair housing issue.  However, gentrification is not a
    Fair Housing Act issue.  Congress intended the Act to combat specific types of discrimination; types of
18  discrimination plaintiffs do not allege here.  In sum, the Act's definition of "fair housing" is limited by
19  the substantive policies therein.

20

21          [3] Plaintiffs suggest that the instant case is particularly analogous to Shannon.  However, in
    Shannon, community members argued that the increased concentration of low-income people of color
    would decrease neighboring property values.  Here, plaintiffs argue that the decreased concentration of
22  low-income people of color may increase neighboring property values.  Although the increased
    concentration of low-income people of color threatens the policies of the Act, the decreased
23  concentration of low-income people of color does not, particularly where there will be no net-loss of
    very low-income public housing units citywide.  This juxtaposition further demonstrates plaintiffs'
24  fundamental opposition to the HOPE VI program and its professed policy of deconcentrating low-
25  income populations.

26  ORDER – 5

1    B. Plaintiffs' National Environmental Policy Act Claims

2        Plaintiffs allege that defendants the City of Seattle ("the City") and HUD violated the National

3    Environmental Policy Act ("NEPA") by preparing and approving, respectively, the City's environmental

4    assessment ("EA"). The City's EA concludes that the redevelopment of Rainier Vista will have no

5    significant impact on the human environment. Plaintiffs assert these NEPA claims pursuant to the

6    Administrative Procedures Act. See 5 U.S.C. §§ 702, 706 (2002). Therefore, plaintiffs must

7    demonstrate that defendants' actions were "arbitrary, capricious, an abuse of discretion, or otherwise not

8    in accordance with law" or "without observation of procedure required by law." 5 U.S.C. § 706(2)(A),

9    (D) (2002).

10    As a threshold matter, defendants challenge plaintiffs' standing on numerous grounds. To satisfy

11    constitutional standing requirements, plaintiffs must show: (1) they have suffered some concrete and

12    particularized actual or threatened injury, (2) that injury is fairly traceable to the challenged agency

13    action, and (3) that injury is likely redressable by a favorable decision of the court. Friends of the Earth,

14    Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000). Because plaintiffs' NEPA

15    claims arise pursuant to the APA, plaintiffs must also demonstrate that their claims fall within the "zone

16    of interests" protected by the statute at issue, NEPA. Valley Forge Christian Coll. v. Americans United

17    for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982).

18        With respect to plaintiffs' NEPA claims, defendants' standing arguments are wholly without

19    merit and deserve no significant analysis. There are four named plaintiffs in this action. Two individual

20    plaintiffs are current Rainier Vista residents. Similarly, Friends of Rainier Vista is an organization

21    comprised of current Rainier Vista residents and individuals residing in adjacent communities. Seattle

22    Displacement Coalition, an organization dedicated to preserving the quality and quantity of public

23    housing in Seattle, has at least one member currently residing at Rainier Vista. As proposed, the Rainier

24    Vista redevelopment project would demolish the homes of all current Rainier Vista residents. In

25    addition, the project would result in redesigned streets, sidewalks, public spaces, and the loss of trees.

26    ORDER   6

1  If, as defendants assert, plaintiffs lack standing to challenge the demolition of their own homes and that

2  demolition's impact on the human environment, the Court has difficulty imagining what party would.

3  For purposes of this motion, the Court is satisfied that plaintiffs satisfy all constitutional and prudential

4  standing requirements. See generally Shannon, 436 F.2d at 817-18.

5  1.  Plaintiffs' NEPA Claim Against the City

6       Plaintiffs allege that the City's EA is deficient in a number of respects.  Ultimately, plaintiffs

7  contend that the City had a duty to prepare an environmental impact statement.  NEPA demands that the

8  City, in its EA, take a "hard look" at the redevelopment project's environmental impacts before issuing a

9  finding of no significant impact ("FONSI").  See Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d

10  722, 730 (9th Cir. 2001).  The Court identifies the following potential deficiencies, among several others

11  asserted by plaintiffs, in the City's EA: the EA's failure to properly incorporate the Authority's draft and

12  final environmental impact statements, upon which the EA principally relies;[4] the EA's purported

13  reliance on sections of those statements that actually contradict the EA's conclusions of no significant

14  impact; and the EA's failure to provide a convincing statement of reasons why the redevelopment

15  project will have no significant impact on the human environment.

16       However, plaintiffs' NEPA arguments focus on the human environmental impacts of dislocation,

17  temporary and permanent relocation, homelessness, gentrification, altered cultural diversity, access to

18  unique social services, and an increased and geographically-shifting demand for public housing units

19  citywide.  The Council on Environmental Quality regulations mitigate against these underlying

20  substantive deficiencies identified by plaintiffs:

21      *Human environment* shall be interpreted comprehensively to include the natural and physical
    environment and the relationship of people with that environment. . . . This means that

22      economic or social effects are not intended by themselves to require preparation of an
    environmental impact statement.  When an environmental impact statement is prepared and

23      economic or social and natural or physical environmental effects are interrelated, then the

24
_____

25      [4] The Court notes that plaintiffs assert no claim against the Authority pursuant to the Washington
State Environmental Policy Act.

26  ORDER  7

1   environmental impact statement will discuss all of these effects on the human environment.

2   40 C.F.R. § 1508.14 (2001) (italics in original).  Although plaintiffs make passing reference to effects on

3   trees, street-layout, and sidewalks, their arguments overwhelmingly focus on a combination of

4   socioeconomic effects associated with the Rainier Vista redevelopment project.  As plaintiffs note, 40

5   C.F.R. § 1508.8(b) defines socioeconomic impacts, such as land use and population growth, as "indirect

6   effects" appropriate for agency consideration.[5]  However, that regulation cannot be read in isolation.

7   Section § 1508.14 dictates that socioeconomic impacts "will" be discussed "[w]hen" an environmental

8   impact statement is prepared; not that such impacts "by themselves" require preparation of an impact

9   statement.  Thus, on the evidence presently before the Court, the Court concludes that plaintiffs

10  demonstrate the presence of serious legal issues and a possibility, but not a probability, of success on the

11  merits.

12  2.  Plaintiffs' NEPA Claim Against HUD

13      Plaintiffs argue that HUD's violation of NEPA consists of the "failure to address the City's

14  omissions in the EA and FONSI"; the failure to conduct an "adequate review" of the EA and FONSI; the

15  failure "to require the City to address both the beneficial and adverse impacts of the proposed HOPE VI

16  redevelopment as required by 24 C.F.R. Part 58, Subpart E"; and that when HUD "approved the RROF

17  and certification over the objections of the plaintiffs, it misconstrued 42 U.S.C. § 1437x and its

18  regulations."  HUD argues that it appropriately delegated its substantive NEPA responsibilities to the

19  City pursuant to 42 U.S.C. § 1437x(a)(1).  That statute provides:

20      [T]he Secretary may . . . provide for the release of funds for projects or activities under this
        subchapter . . . if the State or unit of general local government . . . assumes all of the
21      responsibilities for environmental review, decisionmaking, and action pursuant to [NEPA],
        and such other provisions of law as the regulations of the Secretary may specify, which
22      would otherwise apply to the Secretary with respect to the release of funds.

23  _____

24      [5] The Court notes that the final clause of the relevant sentence directly relates these indirect
    effects to the environment: "and related effects on air and water and other natural systems, including
25  ecosystems."  Here, plaintiffs assert no such related effects.

26  ORDER – 8

Plaintiffs fail to identify either statutory or regulatory language that imposes a duty on HUD to "address" the City's omissions, "adequate[ly] review" the EA and FONSI, or to "require" the City to address impacts outlined in Subpart E when HUD has lawfully delegated NEPA responsibilities to a responsible entity.  Plaintiffs do not contend that HUD unlawfully delegated those responsibilities or that the City is not an appropriate responsible entity.  The Court notes the relevance of § 1437x(b):

> The Secretary shall approve the release of funds subject to the procedures authorized by this section only if . . . the public housing agency has submitted to the Secretary a request for such release accompanied by a certification of the State or unit of general local government which meets the requirements of subsection (c) of this section.  *The Secretary's approval of any such certification shall be deemed to satisfy the Secretary's responsibilities under the National Environmental Policy Act of 1969* [42 U.S.C. § 4321 et seq.] and such other provisions of law as the regulations of the Secretary specify insofar as those responsibilities relate to the release of funds which are covered by such certification.

(emphasis added).  Plaintiffs do not argue that the City's certification does not satisfy the technical requirements of subsection (c).

Plaintiffs cite 24 C.F.R. § 58.72(b), which provides that HUD "may disapprove a certification and RROF if it has knowledge that the responsible entity has not complied with the items in § 58.75." Section 58.75 outlines the types of objections HUD "will consider" regarding a responsible entity's environmental review.  Such objections include noncompliance with substantive obligations outlined by 24 C.F.R. § 58.40.  Plaintiffs allege that the City violated these substantive obligations.  Further, as outlined above, plaintiffs contend that HUD has an affirmative duty to "address", "require the City to address", or "adequate[ly] review" these alleged violations.  However, by its plain language, § 58.40 circumscribes the conduct and environmental review of the responsible entity, not HUD.

The affirmative duties plaintiffs seek to impose on HUD contradict the spirit of § 1437x(b), quoted in italics above, and frustrate the fundamental purpose, outlined in § 1437x(a)(1), of delegating "all" NEPA responsibilities to an appropriate responsible entity.  Plaintiffs do not dispute that HUD considered their objections, as required by § 58.75.  Similarly, plaintiffs cite no language, and the Court's research reveals none, imposing an affirmative duty on HUD to conduct an independent

ORDER – 9

1   substantive review of the responsible entity's environmental analyses. Rather, plaintiffs challenge the

2   fact that HUD did not embrace their objections to the extent that HUD invoked its *discretionary*

3   *authority* to disapprove the certification and RROF pursuant to § 58.72(b). That is, plaintiffs suggest

4   that HUD's decision *not to disapprove* the certification and RROF was arbitrary, capricious, an abuse of

5   discretion, or otherwise not in accordance with the law. This is a particularly high burden. On the

6   record presently before it, the Court concludes that plaintiffs demonstrate very little likelihood of

7   success on the merits on their NEPA claim against HUD.

8   C. The Public Interest and Balance of Hardships

9       The preliminary injunctive relief plaintiffs seek would "preserve the status quo while requiring

10  the defendants to conduct an adequate environmental review and assess the fair housing impacts of its

11  [sic] proposed actions." Plaintiffs assert the following equitable interests and hardships: the public

12  interest demands strict procedural compliance with NEPA, and plaintiffs' unique interests cannot be

13  adequately protected if HUD's release of HOPE VI funds and the demolition of Rainier Vista units

14  proceed. Defendants, who uniformly oppose the relief plaintiffs seek, assert the following equitable

15  interests and hardships: the public's interest in the replacement of severely distressed public housing, the

16  interest of tenants seeking to return to a redeveloped Rainier Vista, the existing units drain on the

17  Authority's resources, the current vacancy of half of those units, and the risk of losing the $35 million

18  HOPE VI grant. In addition, HUD argues that its release of funds, which does not produce the harms

19  alleged by plaintiffs, cannot produce irreparable injury or impact the balance of hardships.

20      Plaintiffs fundamentally oppose the redevelopment of Rainier Vista with HOPE VI funds.

21  Rather, they seek the improvement of existing structures, streets, and other public and private spaces.

22  The Court agrees that the preliminary relief sought by plaintiffs is necessary to fully protect these

23  interests during the pendency of this action. The Court also recognizes that the public interest in full

24  NEPA compliance usually demands the preservation of the status quo. See generally Sierra Club v.

25  Marsh, 872 F.2d 497, 500 (1st Cir. 1989). However, a number of factors lead the Court to conclude that

26  ORDER – 10

1 the equitable interests and balance of hardships do not tilt in plaintiffs' favor.

2       First, the public has a strong interest in its public housing infrastructure.  This infrastructure must

3 serve many generations of tenants.  The public, which includes future generations of tenants, has an

4 interest in quality, structurally-sound low-income public housing.  Plaintiffs make no discernable effort

5 to dispute the severely distressed condition of the existing Rainier Vista structures.  The public's interest

6 in public housing infrastructure includes an interest in access to public housing funds.  A preliminary

7 injunction threatens the $35 million HOPE VI grant for the redevelopment of Rainier Vista.  The

8 Authority does not have access to those funds to simply improve or remodel the existing structures

9 because HOPE VI dictates a specific policy of redevelopment.  Although plaintiffs express concerns as

10 to the wisdom of this policy, their concerns do not outweigh the public's interest in its public housing

11 infrastructure.

12       Second, plaintiffs concede that the Authority has "ostensibly committed" to one-for-one

13 replacement of units affordable to very low-income families and individuals.  One-for-one replacement

14 is a public interest that was previously raised during the Rainier Vista redevelopment planning process.

15 Thus, the Rainier Vista redevelopment will not result in a net-loss of such units citywide.  Nevertheless,

16 plaintiffs complain that 100 units will be reserved for disabled and elderly residents and that current

17 residents have no guarantee of returning to apartments with the same number of bedrooms.  The Court

18 finds these arguments highly unpersuasive; they certainly do not merit the extraordinary injunctive relief

19 plaintiffs seek.  The public's interest in preserving the net number of public housing units affordable to

20 very low-income families and individuals does not tilt in plaintiff's favor.

21       Third, the Court is particularly concerned with the burdens and hardships a preliminary

22 injunction would impose on the approximately 600 Rainier Vista residents who have already relocated.

23 These residents have weathered several years of planning and anxiety, relocation counseling, and

24

25

26 ORDER – 11

1  relocation to other public housing units citywide.[6]  The Authority has made a commitment to these

2  residents that they may return to the redeveloped Rainier Vista if they remain tenants in good standing.[7]

3  Moreover, in May 1999, the duly-elected Rainier Vista Leadership Team Board, comprised of Rainier

4  Vista residents, endorsed the redevelopment project.  Also, at a May 10, 1999 meeting, 84 of 102

5  individuals who responded expressed general support for the project.  Although the Team Board vote

6  was far from unanimous and 170 residents expressed serious concerns in 1999 regarding the project, the

7  record suggests that a majority of the residents supported the project.  Plaintiffs ignore the fact that the

8  preservation of their interests via a preliminary injunction imposes equivalent burdens and hardships on

9  a class of similarly-situated individuals, their neighbors.  The majority of these individuals supported or

10  acquiesced in the redevelopment plan and have a strong interest in returning to a redeveloped Rainier

11  Vista as soon as possible.  Likewise, the longer Rainier Vista sits vacant, the longer the relocation units

12  remain occupied.

13      Finally, the class of NEPA deficiencies identified by plaintiffs – deficiencies that principally

14  relate to the City's review of socioeconomic issues – does not so threaten the public's interest in

15  complete procedural compliance with NEPA as to dictate the extraordinary relief plaintiffs seek here.

16  Because plaintiffs fail to establish a probability of success on the merits, they must demonstrate that the

17  balance of hardships strongly tilts in their favor.  For the reasons stated above, plaintiffs fail to do so.

18  The Court concludes that the unique factual circumstances present here do not support the preservation

19  of the status quo.  Therefore, the Court DENIES plaintiffs' motion for preliminary injunction.

20

21      [6] It appears that approximately 177 residents have chosen to permanently relocate as a result of

22  the redevelopment project.

23      [7] The May 1999 Rainier Vista HOPE VI Leadership Team Agreement between the Seattle
    Housing Authority and the Team Board defines "good standing" as "complying with all terms of their

24  lease agreement as defined by federal regulations, state and local laws.  The parties agree that SHA will
    not make changes to the Rainier Vista Residents' lease agreement unless such changes in lease

25  agreements are also implemented Authority-wide."

26  ORDER – 12

III.  SEATTLE HOUSING AUTHORITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Authority moves for partial summary judgment on plaintiffs' NEPA claims and Fair
Housing Act claims.[8]  Pursuant to Fed. R. Civ. P. 56(b), "[a] party against whom a claim, counterclaim,
or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without
supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."  The
party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c) (2002); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986).

Plaintiffs argue that the Authority's motion is procedurally infirm because the Authority moves
for summary judgment on claims not asserted against it.  The Court agrees.  Pursuant to the plain text of
Rule 56, a party is simply not entitled to judgment as a matter of law on claims not asserted against that
party.  The Authority cites no authority to the contrary.  Although it cites a single unpublished decision
from a magistrate judge in the Northern District of Illinois, the most cursory reading of that case exposes
its irrelevance to the instant circumstances.  Although it is undisputed that the Authority has a practical
interest in plaintiffs' NEPA claims against its co-defendants, the Authority is not currently party to those
claims.  Therefore, the Court DENIES defendant Seattle Housing Authority's motion for partial
summary judgment.[9]

IV.  CONCLUSION

Defendants do not dispute that the Rainier Vista redevelopment project may impact over time

---

[8] As discussed above, plaintiffs fail to state a claim upon which relief can be granted pursuant to
the Fair Housing Act.  Thus, with the respect to those claims, the Authority's motion for partial
summary judgment is DENIED as moot.

[9] Moreover, as plaintiffs note, the timing of the Authority's motion is inappropriate.  The Court is
unable to view the relevant body of evidence in the light most favorable to plaintiffs when that evidence,
the complete administrative record, is not before the Court.

ORDER – 13

1  demographics and property values in the Rainier Valley. Neither does the Court. However, the facts,

2  legal issues, and equities before the Court do not merit the injunctive relief plaintiffs seek. In sum,

3  plaintiffs' motion for preliminary injunction is DENIED. Similarly, defendant Seattle Housing

4  Authority's motion for partial summary judgment is DENIED. Further, plaintiffs' Fair Housing Act

5  claims are DISMISSED for failure to state a claim upon which relief can be granted.

6      SO ORDERED this ___ day of October, 2002.

7

8  _____

9  CHIEF UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  ORDER   14